1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

9

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  CHRISTY RHEIN | ) CASE No.: 1:09-cv-01754-JLT |
| 12             Plaintiff, | ) |
| | ) ORDER ON PLAINTIFF'S SOCIAL |
| 13       vs. | ) SECURITY APPEAL DIRECTING REMAND PURSUANT TO SENTENCE FOUR OF 42 |
| 14  MICHAEL J. ASTRUE, | ) U.S.C. § 4-5(g) |
|      Commissioner of Social Security | ) |
| 15             Defendant. | ) ORDER DIRECTING THE ENTRY OF |
| | ) JUDGMENT IN FAVOR OF PLAINTIFF |
| 16 | ) |
| 17 _____ | ) |

18

**BACKGROUND**

19          Plaintiff Christy Rhein asserts that she is entitled to SSI benefits because she is presumed to

20  be disabled due to mental retardation.  Plaintiff asserts that the ALJ erred when he determined that

21  there was no evidence that she had an IQ of 70 or below before age 22 and when he determined

22  that Plaintiff failed to prove that she had a physical or mental impairment that imposed "additional

23  and significant work-related limitation of function."  For the reasons set forth below, the Court

24  **REMANDS** the matter pursuant to sentence four of 42 USC § 4-5(g).

25

**FACTS AND PRIOR PROCEEDINGS**[1]

26          On September 7, 2006, Plaintiff filed an application for  supplemental security income

27

28  _____

[1]  References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1  ("SSI") benefits under Title XVI of the Social Security Act.  AR at 115-20.   After the agency

2  denied her application, Plaintiff requested a hearing before an Administrative Law Judge.  On

3  December 2, 2008, the ALJ issued a decision denying benefits.  Id. at 8-19.  On August 3, 2009,

4  the Appeals Council affirmed this decision.  Id. at 1-3.

5      Hearing Testimony

6      At the hearing on September 18, 2008, Plaintiff testified that she completed the 12th grade.

7  AR at 29.  She explained that she was in special education classes throughout much of high school

8  and middle school.  Id. at 46-47.  She testified that in high school, during a typical school day, she

9  attended four special education classes and two regular classes.  Id. at 46.

10     Plaintiff, who was nearly 57-years-old at the time of the hearing, testified that she never

11  held a job but that she took care of her elderly grandmother for about five years.  AR at 30.  In

12  exchange for this care, Plaintiff reported that she received free room and board.  Id.  She stated that

13  this arrangement ended about five years before the hearing.  Id.

14     Plaintiff testified that she suffered from anxiety.  AR at 52.  She stated that this made her

15  hand shake.  Id.  Plaintiff admitted that she had a "little bit" of anger and estimated that she would

16  get "mad" about once a week.  Id.  However, she stated that she tried to avoid fighting with others

17  and would attempt to walk away from conflict.  Id. at 53.  Nevertheless, she stated that if she got

18  into a conflict and became angry, she would need about one hour to calm down.  Id.

19     Plaintiff testified that she saw a psychiatrist (AR at 50) and that she took prescribed

20  medications.  Id. at 38, 51.  Plaintiff stated that she had no suicidal thoughts and did not have

21  hallucinations.  AR at 38. Plaintiff testified that she attended a mental outpatient program at Hope

22  House.  AR at 34.  She characterized Hope House as a "club" for mentally impaired persons.  Id.

23  She stated that she needed, and had obtained, a doctor's approval to participate in the program.

24  See id. at 48.  She said that she went to Hope House every day from about 10:00 a.m. until 4:00

25  p.m.  Id. at 35.  At Hope House, she stated that she played games on the computer for several hours

26  and did puzzles.  Id. at 35, 49.

27     Plaintiff stated that a doctor told her to lose weight (she stated that she weighed about 218

28  pounds and was five-foot seven-inches tall).  AR at 39.  She said that she was put on a diet but was

2

only about 10 percent compliant.  Id.  Plaintiff stated that she needed to take about four bathroom breaks a day because of a renal problem.  AR at 54.  She estimated that each break would take 20 minutes at a time.  Id. at 55.

Plaintiff believed that she could lift and carry up to 150 pounds at a time.  AR at 40.  She estimated that she could carry this weight for approximately two hours in an eight-hour day.  Id.  She believed also that she could stand for about 10 minutes at a time, sit for about 10 minutes at once, and walk for about 20 to 25 minutes at a time.  Id.  She stated that she did not have pain or suffer from fatigue.  Id.

Plaintiff testified that she did not have much difficulty concentrating or paying attention.  AR at 41.  She qualified this by stating that sometimes she did have difficulty concentrating but that if she enjoyed what she was doing, like playing games on a computer, she could concentrate effectively for up to four hours at a time.  Id. at 49.

Plaintiff testified that she lived alone and she took care of her personal needs.  AR at 32-33.  She reported that she cooked her own meals, washed dishes and cleaned up after herself.  Id.  at 33-34.  Plaintiff stated that she made her own bed, changed the sheets every week or two, used the washer and dryer about once a week, vacuumed, swept, mopped the floor and emptied the trash.  Id. at 36-37. Plaintiff reported that she shopped for groceries about three times a week.  AR at 34.

Plaintiff testified that she did not have a driver's license and had never driven a car.  AR at 31.  She stated that she rode a bicycle and stated also that her mother would take her places.  Id.  She estimated that she used her bicycle three times a day and rode as many as ten miles.  Id. at 32, 47.  She said that sometimes she walked also.  Id. at 32.

Cheryl Chandler, a vocational expert ("VE"), testified.  In his first hypothetical posed to the VE, the ALJ described a person of Plaintiff's age, education, language, experience and background.  AR at 43.  The person could manage funds, had a "fair" ability to understand and remember detailed instructions and was "slightly" limited in the ability to understand and remember short and simple instructions, to maintain attention and concentration, to accept instruction from supervisors and respond appropriately, to sustain an ordinary routine without special supervision, to complete a normal work day or work week without interruptions at a

3

1  consistent pace and to interact appropriately with coworkers.  The person had a "minimal" chance

2  of emotional deterioration at work.  AR at 43.  In response, the VE opined that such a person was

3  capable of performing "the entire world" of unskilled jobs and could be analyzed pursuant to the

4  agency "grids."  AR at 44.

5       In a second hypothetical, the ALJ described a person who could perform simple tasks but

6  who had to avoid detailed and complex tasks.  AR at 44.  The VE stated that such a person could

7  also perform all unskilled jobs.  Id.

8       In a third hypothetical, the ALJ described a person with no computer word processing

9  skills, who exercised poor judgment, couldn't keep a secret, did not apologize for unintentional

10 mistakes, could manage many household chores, could not care for children and who was

11 handicapped in the areas of economic "sufficiency," in the ability to live independently and in the

12 ability to use social judgment.  AR at 44.  The VE stated that this hypothetical was too "nebulous"

13 and vague to permit a determination of the ability to work.  AR at 45.

14      Finally, in a fourth hypothetical, the ALJ described a person who could lift and carry 150

15 pounds for up to two hours in an eight-hour day, stand for 10 minutes at a time, sit for 10 minutes

16 at a time, and walk for 20 minutes at one time.  AR at 45.  As to this hypothetical person, the VE

17 opined that this person would be limited to sedentary work but could perform jobs including hand

18 packager, material handler and assembly worker.  AR at 45.

19      Relevant Medical Evidence

20      Progress notes from Madera Behavioral Center between February and August 2006

21 recorded Plaintiff's treatment for mental impairments.  AR at 181-93.  The notes documented

22 Plaintiff's difficulties with abstract thinking and respect for the "boundaries" of others.  See id. at

23 187.  In addition, the notes recorded Plaintiff's problems with anger management and anxiety and

24 noted that she had "interpersonal" issues with her mother and grandmother.  See id. at 183.

25 Additional notes between December 2006 and July 2008 recorded Plaintiff's treatment, essentially,

26 for these same issues.  See id. at 236-59.

27      On March 31, 2006, Dr. Michael Kesselman, a clinical psychologist, examined Plaintiff.

28 He noted that Plaintiff was neatly groomed but was overweight.  AR at 298.  He noted also that

1    she had difficulty finding words to express her thoughts and had "slightly rapid" speech.  Id.  In

2    addition, he noted that she laughed inappropriately, fidgeted and seemed "childish and immature."

3    Id.  He described her as nervous and flustered.  Id.

4         Dr. Kesselman administered several tests including the Wechsler Adult Intelligence Scale-

5    III (WAIS-III), Wide Range Achievement Test-3 (WRAT-3) and the Vineland Adaptive Behavior

6    Scales-II.  AR at 298.  Based on the WAIS-III, Dr. Kesselman found that Plaintiff had a verbal IQ

7    of 63, a performance IQ of 83, and a full-scale IQ of 69.  AR at 299.  He interpreted the WRAT-3

8    testing as indicating a sixth-grade reading level which was consistent with borderline intellectual

9    functioning.  Id.  He noted that Plaintiff's math skills were at a third grade level and indicated mild

10   retardation.  Id.  He construed the Vineland-II testing as consistent with an individual who was

11   "developmentally delayed."  AR at 300.

12        Dr. Kesselman diagnosed Plaintiff with anxiety disorder, not otherwise specified, and with

13   provisional borderline intellectual functioning with verbal skills in the mild retardation range.  AR

14   at 300.  Overall, he characterized Plaintiff's IQ and WRAT scores as indicating borderline

15   intellectual functioning and her Vineland adaptive functioning and math skills as indicating mild

16   retardation.  Id.  He noted also that she had trouble with anger and noted her placement in an anger

17   management program.  Id.  He opined that Plaintiff could not prepare a "main" meal for the day

18   and believed that she had deficits in daily living skills and impaired social judgment.  Id. at 301.

19   He believed that she had a "substantial handicap" in her ability to live independently and manage

20   funds and he believed also that her judgment and communication skills would make it difficult for

21   her to find and keep a job.  Id. at 300.

22        On December 28, 2006, Dr. Greg Hirokawa examined Plaintiff.  Dr. Hirokawa performed a

23   mental status examination that tested Plaintiff's abilities in attitude and behavior, mental

24   activity/speech, content of thought, mood/affect, intellectual functioning, memory, function of

25   knowledge (Plaintiff identified three presidents but did not know the name of California's governor

26   or the state capitol), concentration, abstract thought, and judgment.  AR at 210-12. Plaintiff

27   complained of mild depression and anxiety and told him of the recent deaths of her father and

28   grandmother.  AR at 209.  She reported difficulties in concentration and with short-term memory.

1    Id.

2         Plaintiff told Dr. Hirokawa that she performed household chores including vacuuming and

3    laundry.  AR at 212.  She told him that in a typical day she woke up and went to her mother's

4    home.  Id.  Afterwards she would "run around" and talk to people, play pool and work puzzles.  Id.

5    Plaintiff told Dr. Hirokawa she had many friends with whom she shared both good and poor

6    relationships.  Id.

7         Dr. Hirokawa diagnosed Plaintiff with adjustment disorder with mixed emotional features,

8    bereavement and "mild" depression and anxiety.  AR at 212.  He noted low-average intellectual

9    functioning and "good" communication skills.  Id.  He characterized the likelihood of improvement

10   in these areas of functioning in the next year as only "fair."  Id.  He noted that Plaintiff lacked a

11   work history.  Id.  Dr. Hirokawa believed that Plaintiff was capable of managing her own funds.

12   AR at 212.  He believed she was "slightly limited" in her ability to understand and remember very

13   short and simple restrictions, to maintain attention and concentration, to accept instructions from

14   supervisors, to maintain an ordinary work routine at a consistent pace without interruption, to

15   interact with co-workers and to deal with changes in the workplace.  Id. at 212-13.  In addition, Dr.

16   Hirokawa believed that Plaintiff had a "fair" ability to understand and remember detailed

17   instructions and that she had a "minimal" likelihood of emotional deterioration in the workplace.

18   Id. at 213.

19        On January 29, 2007, Dr. H.T. Unger, a non-examining agency consultant, completed a

20   Psychiatric Review Technique form based upon a review of Plaintiff's records.  He noted that

21   Plaintiff suffered from "affective disorders" but believed they were not severe.  AR at 214.  Dr.

22   Unger diagnosed adjustment disorder "with mixed emotional features."  Id. at 217.  He described

23   "mild" limitations in daily living, maintaining social functioning and maintaining concentration,

24   persistence and pace. Id. at 224.  He noted insufficient evidence about any episodes of

25   decompensation.  Id.  Citing Dr. Hirokawa's findings, Dr. Unger believed that Plaintiff's mental

26   impairments were "nonsevere."  AR at 226.  Also, the next day an agency nonexaming consultant,

27   J.M. Risinger, completed a "Case Analysis" and opined that Plaintiff could perform work

28   involving simple, repetitive tasks.  Id. at 230.

1   ///

2   <u>ALJ Findings</u>

3        The ALJ evaluated Plaintiff pursuant to the customary five-step sequential evaluation.  The

4   ALJ determined first that Plaintiff had not engaged in substantial gainful activity since August 18,

5   2006. AR at 13.  Second, he found that Plaintiff had the following severe impairments: provisional

6   borderline intellectual functioning; provisional anxiety disorder; adjustment disorder with mixed

7   features; and bereavement.  <u>Id</u>.  Third, the ALJ determined that Plaintiff did not have an

8   impairment, or a combination of impairments, that met or exceeded the level required under

9   Agency guidelines for presumed disability.  <u>Id</u>. at 14.

10       Fourth, the ALJ determined that Plaintiff had the Residual Functional Capacity ("RFC") to

11  perform a full range of work at all exertional levels and can perform simple repetitive tasks, but

12  should avoid detailed and/or complex tasking.  AR at 15.  The ALJ found that Plaintiff had no past

13  relevant work but, based on his RFC assessment and the testimony of the VE, the ALJ concluded

14  that Plaintiff retained the ability to perform a "significant number" of jobs in the national economy

15  (step five).  <u>Id</u>. at 18.  As a result, the ALJ determined that Plaintiff was not disabled as defined by

16  the Act.  <u>Id</u>. at 19.

17  **SCOPE OF REVIEW**

18       Congress has provided a limited scope of judicial review of the Commissioner's decision to

19  deny benefits under the Act.  When reviewing the findings of fact, the Court must determine

20  whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. 405 (g).

21       Substantial evidence means "more than a mere scintilla," <u>Richardson v. Perales</u>, 402 U.S.

22  389, 402 (1971), but less than a preponderance.  <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119, n.

23  10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to

24  support a conclusion." <u>Richardson</u>, 402 U.S. at 401.  The record as a whole must be considered,

25  weighing both the evidence that supports and the evidence that detracts from the Commissioner's

26  conclusion.  <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985).  The Court must uphold the

27  determination that the claimant is not disabled if the Commissioner applied the proper legal

28  standards and if the findings are supported by substantial evidence.  *See* <u>Sanchez v. Sec'y of Health</u>

1  and Human Serv., 812 F.2d 509, 510 (9th Cir. 1987).

2  **REVIEW**

3      In order to qualify for benefits, a claimant must establish that he is unable to engage in

4  substantial gainful activity due to a medically determinable physical or mental impairment which

5  has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C.

6  § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of such

7  severity that he is not only unable to do his previous work, but cannot, considering his age,

8  education and work experience, engage in any other kind of substantial gainful work which exists

9  in the national economy.  Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989).  The

10 burden is on the claimant to establish disability.  Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir.

11 1990).

12     In an effort to achieve uniformity of decisions, the Commissioner has promulgated

13 regulations which include the five-step sequential disability evaluation process described above.

14 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[2]  Here, Plaintiff challenges the ALJ's

15 determination at step three of the sequential evaluation process, where the ALJ assesses whether

16 her impairments meet or equal agency requirements for presumed disability.

17 **DISCUSSION**

18     Plaintiff raises just one claim of error on appeal.  She contends that the ALJ erred in

19 concluding that her mental impairments did not meet or equal the listings for mental retardation at

20 20 C.F.R., Part 404, Subpart P, App. 1, § 12.05C to establish presumptive disability.  (See Doc. 15

21 at 6-9).

22     The introductory paragraph of § 12.05 states that,

23     Mental retardation refers to significantly subaverage general intellectual functioning
24     with deficits in adaptive functioning initially manifested during the developmental
       period; i.e., the evidence demonstrates or supports onset of the impairment before
25     age 22.

26 In addition, subsection C requires an additional showing of "[a] valid verbal, performance, or full

27

28    [2]All references are to the 2000 version of the Code of Federal Regulations unless otherwise noted.

8

1   scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and

2   significant work-related limitation of function."

3        As part of his step three analysis, the ALJ analyzed whether Plaintiff's mental impairments

4   satisfied the criteria of § 12.05 of the listings.  He acknowledged that Plaintiff satisfied the first

5   prong of § 12.05C because she "does have a valid verbal and full scale IQ between 60 through 70."

6   AR at 14.  However, he found that Plaintiff failed to satisfy the second prong of subsection C that

7   requires a showing of "a physical or other mental impairment imposing additional and significant

8   work-related limitation of function."  Id.[3]  In addition, the ALJ concluded that Plaintiff failed to

9   establish that her condition manifested itself during the "developmental period" prior to age 22.  Id.

10  Plaintiff asserts that the ALJ erred in concluding that these criteria were not satisfied.

11       A.    Plaintiff provided sufficient evidence to create a presumption that her subaverage

12              level of intellectual functioning existed prior to age 22

13       As a threshold matter, § 12.05 requires that a claimant establish that her condition existed

14  "during the developmental period, i.e., the evidence demonstrates or supports onset of the

15  impairment before age 22."  On this point, the ALJ determined that although Plaintiff had valid

16  verbal and full scale IQ scores between 60 and 70 as required by subsection C, "there is no

17  indication that claimant had such scores before the age of 22 (though I do note a history of special

18  education; but there is a lack of prior IQ score history)."  AR at 14.

19       Plaintiff does not argue nor point to specific evidence supporting the existence of mental

20  retardation during the developmental stage.  Instead, she argues that given her valid IQ scores as an

21  adult, she is entitled to a presumption that her impairment existed during the developmental phase.

22  To support her position, Plaintiff relies on Hodges v. Barnhart, 276 F.3d 1265, 1268-69 (11th Cir.

23  2001).  In that case, the Eleventh Circuit, citing  Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001)

24  and Luckey v. U.S. Dept. Of Health and Human Services, 890 F.2d 666, 668 (4th Cir. 1989), held

25  that, despite a lack of IQ evidence before age 22, IQ tests produced after age 22 which satisfy the

26  criteria of § 12.05C "create a rebuttable presumption of a fairly constant IQ throughout [a

27

28        [3]  As noted, based on clinical testing, Dr. Kesselman documented a verbal IQ of 63 and a full-scale IQ of 69.  AR at 299.

1   claimant's] life." <u>Hodges</u>, 276 F.3d at 1268.  Based on this, the court remanded and directed that

2   the ALJ "presume, based on this evidence, mental impairment before age twenty-two." <u>Id.</u> at 1269.

3   The court's holding was predicated on the notion that, absent evidence of trauma, it is to be

4   assumed that a person's IQ remains relatively constant throughout life.  <u>See Hodges</u>, 276 F.3d at

5   1268-69; <u>see also</u> <u>Muncy</u>, 247 F.3d at 734; <u>Luckey</u>, 890 F.2d at 668.

6          Other courts have been reluctant to adopt a *per se* presumption based solely on a finding of

7   valid qualifying post-developmental IQ scores.  For instance, in <u>Foster v. Halter</u>, 279 F.3d 348 (6th

8   Cir. 2001), the court held that the requirements of § 12.05C for manifestation of the required

9   impairment during the developmental stage were not met where no testing was performed prior to

10  age 42.  279 F.3d at 355.  In addition, the Third Circuit declined to accept a *per se* presumption

11  based upon post-developmental IQ scores, holding that, in addition, "the record should contain

12  some evidence that supports the finding that onset preceded age 22."  <u>See</u> <u>Markle v. Barnhart</u>, 324

13  F.3d 182, 189 (3rd Cir. 2003).   In both cases, the courts evaluated whether evidence beyond post-

14  developmental IQ scores demonstrated or at least created an inference that the claimant's deficits

15  in mental functioning predated age 22.  <u>See Foster</u>, 279 F.3d at 355; <u>Markle</u>, 324 F.3d at 188.

16          Several district courts in the Ninth Circuit have cited the "rebuttable presumption"

17  outlined in <u>Hodges</u> favorably.  <u>Jackson v. Astrue</u>, 2008 WL 5210668 (C.D. Cal., Dec. 11, 2008) at

18  *6 ("several circuits have held that valid IQ tests create a rebuttable presumption of a fairly

19  constant IQ throughout a claimant's life. . . .  The Court finds the reasoning of the Seventh, Eighth,

20  and Eleventh Circuits to be persuasive"); <u>Schuler v. Astrue</u>, 2010 WL 1443882 (C.D. Cal., April 7,

21  2010) at *6 (citing <u>Hodges</u>, <u>Muncy</u> and <u>Luckey</u> for the proposition "that a valid qualifying IQ score

22  obtained by the claimant after age 22 creates a rebuttable presumption that the claimant's mental

23  retardation began prior to the age of 22, as it is presumed that IQ scores remain relatively constant

24  during a person's lifetime."); <u>Walberg v. Astrue</u>, 2009 WL 1763295 (E.D. Wash., June 18, 2009)

25  at * 8 (citing <u>Hodges</u> favorably but examining whether evidence in the record is supportive of early

26  onset impairment).  However, in <u>Lawson v. Astrue</u>, 2010 WL 961722 (E.D. Cal., March 16, 2010),

27  the Court, while noting case law supporting the presumption, declined to apply it.   The Court

28  noted that no Ninth Circuit authority supported such a presumption, and further noted that <u>Hodges</u>

1   and other cases applied such a presumption only "where there are no intervening circumstances."

2   Id. at *5.  The court distinguished the facts in Lawson, noting that evidence in that case indicated

3   that "there may have been an intervening event causing a change in [Lawson's] intellectual

4   functioning."  Id.; see also Payne v. Astrue, 2010 WL 654319 (D. Ariz., Feb. 23, 2010) (noting the

5   reluctance of the Sixth Circuit in Foster and the Third Circuit in Markle to adopt a per se

6   presumption of early onset disability based solely on post-developmental IQ scores and looking at

7   the record to examine whether there was at least some evidence of "early onset" deficiency in

8   intellectual functioning).

9        Upon review, the Court declines to accept Plaintiff's argument the she is entitled to a *per se*

10  "presumption" that her impairment existed prior to age 22 based solely on valid, qualifying, post-

11  developmental IQ scores.  The intent of the regulations, supported by case law, places the burden at

12  step three of establishing presumptive disability on the claimant.  See Burch v. Barnhart, 400 F.3d

13  676, 679 (9th Cir. 2005) ("The claimant carries the initial burden of proving disability at steps one

14  through four of the analysis.") Removing this burden of proof frustrates the social security scheme.

15  Likewise, it would render the language of § 12.05C, requiring proof of the onset of the mental

16  disability by age 22, as mere surplusage.  Thus, the Court finds that for such a presumption to

17  apply, Plaintiff is required to provide evidence supporting early onset of the mental impairment

18  *and* that no intervening circumstances have occurred to impact Plaintiff's IQ.  See Markle, 324

19  F.3d at 189.

20       Other cases support this view.  In Payne, the court looked to supportive evidence in the

21  record before adopting the Hodges presumption.  In that case, the court catalogued a variety of

22  circumstances that would provide some evidence of "deficits in adaptive functioning" prior to age

23  22 including, "'a claimant's participation in special education classes, poor academic performance

24  and low-skilled, work history."  2010 WL 654319 at *11.  Nevertheless, the court found that Payne

25  had not established the existence of such deficits where,

26       Plaintiff testified . . . that she graduated from high school and that she did not take
         any special education classes.  Plaintiff also testified that she can read and write and
27       that she passed a written test to get her driver's license.  Additionally, the record
         includes a "Disability Report-form SSA 3368" which indicates that Plaintiff's
28       longest held job was as a material handler from 1988-2003.  Plaintiff's job as a

11

1   material handler was a forty-hour-per-week position, and required the [use] of
2   "technical knowledge or skills.  Additionally, Plaintiff's job involved writing, such
    as "complet[ing] reports," and Plaintiff spent "half" of her time supervising 20
3   people. . . . *Plaintiff's education and work history provide substantial evidence in
    support of the ALJ's finding that Plaintiff had no deficits in her adaptive
    functioning prior to age 22.*"
4
5   2010 WL 654319 at *11.  (Emphasis added).

6       In <u>Gomez v. Astrue</u>, 695 F.Supp.2d 1049 (C.D. Cal. 2010), the court reversed and

7   remanded the ALJ's decision to reject the IQ testing because "[n]othing in the record suggests that

8   plaintiff's subaverage intellectual functioning was of recent origin."  <u>Id</u>. at 1061.  The court cited

9   authority supporting an "inference" of early onset intellectual deficiencies where evidence

10  established that the claimant attended special education classes, dropped out of high school prior to

11  graduation, had trouble reading and writing, and fought at school with other children.  <u>Id</u>.

12      Here, the ALJ accepted that Plaintiff's recent IQ scores met the requirements of §12.05C.

13  AR at 14.  In finding that Plaintiff failed to demonstrate that her IQ was 70 or below before age 22,

14  the ALJ noted that there was no history of IQ scores before age 22.  <u>See</u> AR at 14.  However, a

15  mere absence of IQ scores is not alone a reasonable basis for determining that Plaintiff's

16  impairments did not predate age 22.  In fact, 65 F.R. 50772 (Aug. 21, 2000) states in response to

17  commentary on § 12.05 that "[w]e did not intend the second paragraph of the proposed listing

18  12.05 to require intelligence testing (or other contemporary evidence) prior to age 18," and

19  clarified that the requirement for initial "manifestation" during the developmental period should be

20  "interpreted . . . to include the common clinical practice of inferring a diagnosis of mental

21  retardation when the longitudinal history and evidence of current functioning demonstrate that the

22  impairment existed before the end of the developmental period."  <u>See</u> <u>Hodges</u>, 276 F.3d at 1269;

23  <u>Walberg</u>, 2010 WL 1763295 at *8.

24      Other evidence in the record supports an inference that Plaintiff's mental functioning had

25  an early onset.  Plaintiff's attendance in special education courses began in middle school.  In high

26  school, special education courses comprised the majority of her education. <u>See</u> AR at 172.

27  Likewise, Plaintiff's sister and mother described her level of functioning as having manifested

28  itself during adolescence.   <u>See</u> <u>id</u>. at 136, 175.  For these reasons, and because the record is devoid

245 of 16

1   of any evidence of any circumstance that reduced Plaintiff's mental functioning in her adulthood,

2   the Court finds that the record supports the conclusion that Plaintiff's impaired intellectual

3   functioning existed prior to age 22.

4          B.      <u>The record is unclear whether Plaintiff should be deemed to have satisfied</u>

5                <u>the second prong of § 12.05C</u>

6        In <u>Fanning v. Bowen</u>, 827 F.2d 631, 633 (9th Cir. 1987), the Court held that § 12.05C's

7   "second prong," requiring a "physical or other mental impairment imposing a significant work-

8   related limitation of function," is satisfied if the impairment's "effect on a claimant's ability to

9   perform basic work activities is more than slight or minimal."  Though the Court remanded the

10   matter to determine whether the claimant's physical condition was more than slight, the court

11   noted that in <u>Nieves v. Secretary of Health and Human Services</u>, 775 F.2d 12, 14 (1st Cir. 1985),

12   the court indicated that a step two finding of severity with respect to additional impairments

13   "automatically satisfied" the second prong of § 12.05C.  827 F.2d at 633 n. 3.

14        In response to <u>Fanning</u>, the Commissioner revised the regulations related to mental

15   disorders to clarify that under 12.05C,

16            we will assess the degree of functional limitation the additional impairment(s)
                imposes to determine if it significantly limits your physical or mental ability to do

17            basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1502(c)
                and 416.920(c).  If the additional impairment(s) does not cause limitations that are

18            "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the
                additional impairment(s) imposes an "additional and significant work-related

19            limitation of function" . . .

20   In doing so, the Commissioner explained, "[w]e always have intended the phrase to mean that the

21   other impairment is a 'severe' impairment as defined in §§ 404.1520(c) and 416.920(c)." Revised

22   Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746,

23   50772 (August 21, 2000). Thus, this clarification lends doubt as to the continuing viability

24   <u>Fanning's</u> holding that the "an impairment imposes a significant work-related limitation of

25   function when its effect on a claimant's ability to perform basic work activities *is more than slight*

26   *or minimal*." <u>Fanning</u>, 827 F.2d at 633, emphasis added.

27        Notably, at the second step of his analysis, the ALJ is required to determine whether the

28   claimant has an "impairment or combination of impairments which significantly limits [his] . . .

13

1   ability to do basic work activities." 20 C.F.R. § 404.1520(c).  This Court has determined that

2   where the ALJ finds that Plaintiff has a "severe" impairment at step two, this equates to a finding

3   that the plaintiff met the second prong of the §12.05C listing. <u>Rowens v. Astrue</u>, 2010 U.S. Dist.

4   LEXIS 78121 at *8 (E.D. Cal. Aug. 2, 2010). ("[I]n this circuit, a person who has a severe physical

5   or other mental impairment, as defined at step two of the disability analysis, apart from the

6   decreased intellectual function, meets the second prong of the §12.05(C) listing.") Consistent with

7   this and based upon the Commissioner's revised § 12.05C language, the Court holds that Plaintiff

8   must demonstrate a severe, additional impairment to satisfy this section's second prong. Clearly

9   then, a step two finding of a severe impairment *necessarily* determines that the second prong is

10   satisfied.

11       Here, as recited above, at step two the ALJ determined that Plaintiff had *severe*

12   impairments in her ability to work due to her provisional borderline intellectual functioning,

13   provisional anxiety disorder, adjustment disorder with mixed features and bereavement. AR at 14.

14   However, confusingly, the ALJ found also that "claimant does not have physical or other mental

15   impairment(s) imposing additional and significant work-related limitation of function." AR at 14.

16   Likewise, the ALJ found "that the claimant has the residual functional capacity to perform a full

17   range of work at all exertional levels and can perform simple repetitive tasks but should avoid

18   detailed and/or complex tasking. AR at 15.

19       Likewise, the ALJ cited the findings of Dr. Hirokawa who described Plaintiff's depression

20   and anxiety as "mild" (AR at 212) and opined that Plaintiff had "slight" limitations in her ability to

21   understand and remember very short instructions, maintain concentration and attention and accept

22   instruction from a supervisor or maintain an ordinary work routine. <u>Id</u>. at 213.  Two non-

23   examining agency experts concurred and believed that Plaintiff's impairments were minimal. <u>See</u>

24   <u>id</u>. at 214, 217, 224, 226, 230.   While Dr. Kesselman opined that Plaintiff's intellectual

25   deficiencies compromised her ability to display proper judgment and impacted her communication

26   skills and would, thus, hinder her ability to work, the ALJ noted that Dr. Kesselman's conclusions

27   were contradicted by Plaintiff's own testimony. <u>See</u> AR at 14.  In fact, as noted by the ALJ,

28       The claimant testified that she took care of her grandmother for five years for room

and board.  She stated she rides her bike three times a day, walks every day about 10 miles, lives alone in an apartment on the second floor, can care for her personal needs, prepares meals every day, does dishes three times a day, and shops three times a week.  She said she belongs to and spends six hours at the Hope House and uses the computer for four hours a day.  She testified that she makes her bed every day, changes the sheets twice a week, does laundry once a week, sweep, vacuums, mops, and dusts every other day.  She stated that she rides her bike at least 10 minutes each day.

Regarding credibility, I note the claimant has a dismal nonexistent work history, but I also note she does a fairly wide range of activities of daily living as described above.

Id. at 16 (citation omitted).  Thus, the step two finding cannot be squared with the ALJ's determination that Plaintiff suffers only mild or minimal impact on her ability to work due to her impairments.  Thus, the Court finds that the record is unclear and inconsistent as to whether the ALJ found Plaintiff suffered additional severe impairments under §12.05C.

C.      Remand for further consideration is appropriate

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate repayment of benefits is within the discretion of the district court.  Harman v. Apfel, 211 F.3 1172, 1178 (9th Cir. 2000).  When a court reverses an administrative agency determination, the proper course, except in rare instances, is to remand to the agency for additional investigation or explanation.  Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir. 2004) (citing INS v. Ventura, 537 U.S. 12, 16 (2002)).  Generally, an award of benefits is directed only where no useful purpose would be served by further administrative proceedings or where the record is fully developed.  Varney v. Secretary of Health and Human Services, 859 F.2d 1396, 1399 (9th Cir. 1988).

As noted above, the record is inconsistent such that the Court cannot determine whether Plaintiff should be found to have satisfied the second prong of the § 12.05(C) listing.  Thus, remand is warranted to address this inconsistency. See Jackson v. Astrue, 2008 U.S. Dist. LEXIS 100411, at * 16 (C.D.Cal. December 11, 2008) (remand necessary where "the ALJ failed to resolve the apparent inconsistency between his finding that plaintiff's depression was severe and his finding that plaintiff did not have any other mental impairment that would impose an additional and significant work-related limitation" according to § 12.05(C) of the Listing).

15

**CONCLUSION**

Based on the foregoing, this case is HEREBY REMANDED to the Secretary for further proceedings consistent with this decision.  The Clerk of Court IS DIRECTED to enter judgment in favor of Plaintiff.


IT IS SO ORDERED.

Dated:   **November 23, 2010**                                    **/s/ Jennifer L. Thurston**
                                                                UNITED STATES MAGISTRATE JUDGE

16